# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA

OUR CASE NO:21-6528-STRAUSS

CASE NO. 8:21-cr- 311 TPB-AAS

v.

√√ PAUL ADAM WEXLER and
PAUL EMIL BLEIGNIER

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)
42 U.S.C. § 1320a-7b(b)(2)
18 U.S.C. § 2

FILED BY_____AT_____D.C.

Sep 17, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud and Wire Fraud)

At all times material to this Indictment:

### The Defendants and Relevant Entities

1.      Higher Response Marketing, Inc. ("Higher Response") was a company incorporated under the laws of Florida, with its principal place of business located in Pinellas County.  Higher Response also did business under the name "Empath Genetics" and "MDP."  Higher Response, Empath Genetics, and MDP are collectively referred to in this Indictment as "Empath."  Empath held a bank account ending in 1645 ("Empath Account 1").  Empath also held a bank account ending in 9699 ("Empath Account 2").  Empath purported to market CGx testing.

2.    PAUL ADAM WEXLER was a resident of Pinellas County in the Middle District of Florida.  PAUL ADAM WEXLER controlled and operated Empath.

3.    PAUL EMIL BLEIGNIER was a resident of Pinellas County in the Middle District of Florida.  PAUL EMIL BLEIGNIER also controlled and operated Empath alongside PAUL ADAM WEXLER.

4.    Personalized Genetics, LLC ("Personalized Genetics") was a limited liability company formed under the laws of Pennsylvania.  Personalized Genetics was a Medicare provider with its principal place of business located in Allegheny County, Pennsylvania.  Personalized Genetics also did business as "Personalized Genomics."  Personalized Genetics purported to provide genetic testing services to Medicare beneficiaries.

5.    Trinity Clinical Laboratories, LLC ("Trinity") was a limited liability company formed under the laws of Texas.  Trinity was a Medicare provider with its principal place of business located in Denton County, Texas.  Trinity purported to provide genetic testing services to Medicare beneficiaries.

6.    Med Health Services Management, LP ("Med Health") was a limited partnership formed under the laws of Pennsylvania.  Med Health was a Medicare provider with its principal place of business located in Allegheny County, Pennsylvania.  Med Health purported to provide genetic testing services to Medicare beneficiaries.

2

7.      eLab Partners, Inc. ("eLab") was a company incorporated under the laws of Florida, with its principal place of business located in Broward County, Florida.  ELab purported to market CGx testing.

8.      MedSymphony, LLC ("MedSymphony") and Meetmydoc, LLC ("Meetmydoc") were limited liability companies formed under the laws of South Carolina, with their principal place of business located in Beaufort County, South Carolina.  MedSymphony and Meetmydoc purported to provide telemedicine consultations to Medicare beneficiaries.  MedSymphony and Meetmydoc are collectively referred to in this Indictment as "MedSymphony."

### The Medicare Program

9.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations.  The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

10.     Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

11.     Medicare programs covering different types of benefits were separated into different program "parts."  Medicare Part A covered health services provided by

3

hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, including medical services such as office visits, minor surgical procedures, and laboratory testing that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," is described in further detail below.

12.     Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

13.     A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## Part B Coverage and Regulations

14.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

15.     Novitas Solutions Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions that included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.

16.     To receive Medicare reimbursement, providers had to make the appropriate application to the MAC and execute a written provider agreement.  The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute ... and the ... (Stark law)).

17.     CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

18.     Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary.  For this to occur, the beneficiary would assign the right of payment to the health care provider.  Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### The Medicare Advantage Program

19.     The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed health care benefit programs, sometimes referred to as managed care plans, including health maintenance organizations ("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS"), rather than through the original Medicare program (Parts A and B).

20.     Private health insurance companies offering Medicare Advantage health care benefit programs were required to provide beneficiaries with the same services and supplies offered under Medicare Parts A and B.  To be eligible to enroll in a Medicare Advantage health care benefit program, a person had to have been entitled to benefits under Medicare Parts A and B.

21.     A number of companies, including UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare"), and CVS Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to Medicare Advantage beneficiaries through various programs.

22.     UnitedHealth, Humana, WellCare, and CVS Health were "health care benefit programs," as defined by 18 U.S.C. § 24(b) and "Federal health care programs," as defined by 42 U.S.C. § 1320a-7b(f).

23.     These companies, through their respective Medicare Advantage programs, often made payments directly to physicians, medical clinics, or other health care providers, rather than to the Medicare Advantage beneficiary that received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

24.     To obtain payment for services or treatment provided to a beneficiary enrolled in a Medicare Advantage health care benefit program, physicians, medical clinics, and other health care providers had to submit itemized claim forms to the beneficiary's Medicare Advantage health care benefit program. The claim forms were typically submitted electronically via the internet. The claim form required certain important information, including the information described above in paragraph 5 of this Indictment.

25.     When a provider submitted a claim form to a Medicare Advantage health care benefit program, the provider certified that the contents of the form were

7

true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The submitting party also certified that the services being billed were medically necessary and were provided as billed.

26.     The private health insurance companies offering Medicare Advantage plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received. These payments by Medicare to the insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage health care benefit program, regardless of whether the beneficiary utilized the health care benefit program's services that month. CMS determined the per-patient capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each patient's previous illness diagnoses and treatments. Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

## Cancer Genetic Tests

27.     Cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

8

28.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).  Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

29.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. 42 C.F.R. § 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.*  "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

30.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's

treatment of that cancer.  Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## Telemedicine

31.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

32.     Telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers.  Telemedicine companies typically paid doctors a fee to conduct consultations with patients.  In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

33.     Medicare Part B covered expenses for specified telehealth services if certain requirements were met.  These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.

## The Conspiracy

34.     Beginning in or around June 2018, and continuing through in or around April 2019, in the Middle District of Florida, and elsewhere, the defendant,

PAUL ADAM WEXLER,

10

did knowingly and willfully combine, conspire, confederate, and agree with others

known and unknown to the Grand Jury, to commit certain offenses against the

United States, that is:

    a.    health care fraud, in violation of 18 U.S.C. § 1347; and

    b.    wire fraud, in violation of 18 U.S.C. § 1343.

**<u>Manner and Means of the Conspiracy</u>**

35.    The manner and means by which the defendant and his co-conspirators

sought to accomplish the object and purpose of the conspiracy included, among

others, the following:

    a.  It was part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did operate and control Empath.

    b.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did identify beneficiaries and obtain their medical histories.

    c.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did inform beneficiaries that they were eligible for genetic testing and sent beneficiaries genetic testing kits so that the beneficiaries could self-administer a genetic testing swab.

    d.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did receive the completed genetic testing kits from the beneficiaries and sent, or caused to be sent, the

11

genetic testing kits and beneficiary information to provider laboratories, including Personalized Genetics, Med Health, and Trinity.

e.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did offer and pay illegal kickbacks and bribes to medical practitioners to sign and to prescribe genetic testing orders, commonly referred to as doctor's orders, under the guise of "telemedicine."

f.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did receive doctor's orders authorizing CGx tests that were medically unnecessary and not covered by Medicare and Medicare Advantage plans and sent, or caused to be sent, the doctor's orders to provider laboratories, including Personalized Genetics, Med Health, and Trinity.

g.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did solicit and receive illegal bribes and kickbacks in exchange for sourcing beneficiaries and procuring genetic testing kits from beneficiaries.

h.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did submit, and caused the submission of, claims to Medicare and Medicare Advantage plans obtained through kickbacks and bribes that falsely and fraudulently

12

represented health care benefits, primarily genetic testing, as medically necessary, validly prescribed, and eligible for reimbursement from Medicare and Medicare Advantage plans in the approximate amount of $17.3 million, which Medicare and Medicare Advantage plans paid in excess of approximately $5.2 million.

i.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did as a result of such false and fraudulent claims, receive approximately $1,165,000 in kickbacks and bribes.

j.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did falsify, alter, and fabricate, and cause the falsification, alteration, and fabrication of invoices, billing records, and medical records to support the false and fraudulent claims submitted to Medicare and Medicare Advantage plans.

k.  It was further part of the conspiracy that PAUL ADAM WEXLER and his co-conspirators would and did perform acts, and would and did make statements, to promote and achieve the objects of the conspiracy and to hide and conceal the purposes of the conspiracy and the acts committed in furtherance thereof.

All in violation of 18 U.S.C. § 1349.

## COUNTS TWO THROUGH FOUR
### (Health Care Fraud)

36.     Paragraphs 1 through 33 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### The Scheme and Artifice

37.     Beginning in or around June 2018, and continuing through in or around April 2019, in the Middle District of Florida, and elsewhere, the defendant,

### PAUL ADAM WEXLER,

aided and abetted by others, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud the health care benefit programs Medicare and the Medicare Advantage plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs.

### Manner and Means of the Scheme and Artifice

38.     The substance of the manner and means of the scheme is described in the Manner and Means section of Count One of the Indictment, and the Grand Jury realleges and incorporates by reference those paragraphs as though fully set forth herein.

### Execution or Attempted Execution of the Scheme and Artifice

39.     On or about the date set forth below in each count, in the Middle District of Florida, and elsewhere, in executing and attempting to execute the aforesaid scheme and artifice to defraud Medicare and the Medicare Advantage

14

plans, and to obtain, by means of false and fraudulent pretenses and representations, money under the custody and control of the specified health care benefit programs, affecting interstate commerce, in connection with the delivery of and payment for health items and services, the defendant, PAUL ADAM WEXLER, aided and abetted by others known and unknown, did knowingly and willfully engage in the conduct described in the count:

| Count | Medicare Beneficiary Initials | Approx. Date of Claim Submission | Claim Number | CGx Test Billed; Approx. Amount Billed |
|-------|-------------------------------|----------------------------------|--------------|----------------------------------------|
| TWO | S.B. | August 31, 2018 | 871818243507410 | Molecular Pathology Level 9; $2,200 |
| THREE | M.J. | April 11, 2019 | 452919101205940 | Molecular Pathology Level 9, $2,200 |
| FOUR | F.M. | September 18, 2018 | 871818261568950 | Molecular Pathology Level 9; $2,200 |

Each in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 2.

## COUNT FIVE
### (Conspiracy to Defraud the United States and
### Pay and Receive Health Care Kickbacks)

40.　Paragraphs 1 through 33 of Count One of this Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

### The Conspiracy

41.　Beginning in or around June 2018, and continuing through in or around

April 2019, in the Middle District of Florida, and elsewhere, the defendants,

PAUL ADAM WEXLER and
PAUL EMIL BLEIGNIER,

did knowingly and willfully combine, conspire, confederate, and agree with each

other and others known and unknown to the Grand Jury to:

　　　　a.　　defraud the United States out of money and property and by

impeding, impairing, obstructing, and defeating the lawful functions of

HHS, through its agency CMS, in the administration of the Medicare

and Medicare Advantage plans, by deceit, craft, and trickery; and

　　　　b.　　commit an offense against the United States, that is, soliciting

and receiving remuneration (kickbacks and bribes), in violation of 42

U.S.C. § 1320a-7b(b)(1); and

　　　　c.　　commit an offense against the United States, that is, offering and

paying remuneration (kickbacks and bribes), in violation of 42 U.S.C. §

1320a-7b(b)(2).

<u>**Manner and Means of the Conspiracy**</u>

42.     The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

    a. It was part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators would and did operate and control Empath.

    b. It was further part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators, through Empath, would and did solicit and receive payment in the form of illegal kickbacks and bribes in exchange for referring beneficiaries for genetic testing that was medically unnecessary and not eligible for reimbursement by Medicare and Medicare Advantage plans.

    c. It was further part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators would and did transmit beneficiary information for genetic testing that was medically unnecessary and not covered by Medicare and Medicare Advantage plans.

    d. It was further part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators, through Empath, would and did offer and pay kickbacks and bribes to medical practitioners to sign and to prescribe genetic testing, that

was not medically necessary or covered by Medicare and Medicare Advantage plans, under the guise of "telemedicine."

e.  It was further part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators would and did transfer beneficiary medical information, as well as doctor's orders authorizing CGx testing that was medically unnecessary and not covered by Medicare and Medicare Advantage plans, in exchange for payment in the form of kickbacks and bribes, understanding that the information would be used to support false and fraudulent Medicare and Medicare Advantage plan claims.

f.  It was further part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators would and did facilitate the submission of false and fraudulent claims to Medicare and Medicare Advantage plans totaling approximately $17.3 million, which Medicare and Medicare Advantage plans paid in excess of approximately $5.2 million, for genetic testing that was ineligible for  reimbursement because they were procured through payment of illegal kickbacks and bribes and medically unnecessary.

g.  It was further part of the conspiracy that that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators would and did offer and pay approximately $322,200 in kickbacks and bribes in order to obtain doctor's orders authorizing cancer

genetic tests that were not medically necessary or covered by Medicare and Medicare Advantage plans.

h. It was further part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators would and did disguise and conceal the nature and source of the kickbacks and bribes by, among other conduct, creating and maintaining fraudulent invoices identifying services rendered as lead generation, web services, and marketing.

i. It was further part of the conspiracy that PAUL ADAM WEXLER, PAUL EMIL BLEIGNIER, and their co-conspirators would and did participate in meetings, perform various acts, and make statements to accomplish the objects of the conspiracy and to conceal the conspiracy.

**Overt Acts**

43.    In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Florida, at least one of the following overt acts, among others:

a. On or about June 21, 2018, PAUL ADAM WEXLER and PAUL EMIL BLEIGNIER, through Empath, solicited and received $3,200 in the form of illegal kickbacks or bribes from eLab, which were deposited into Empath Account 1.

b. On or about June 26, 2018, PAUL ADAM WEXLER and PAUL EMIL BLEIGNIER, through Empath, solicited and received $7,300 in the form of illegal kickbacks or bribes from eLab, which were deposited into Empath Account 1.

c. On or about July 20, 2018, PAUL ADAM WEXLER and PAUL EMIL BLEIGNIER, through Empath, solicited and received $19,300 in the form of illegal kickbacks or bribes from eLab, which were deposited into Empath Account 1.

d. On or about September 18, 2018, PAUL ADAM WEXLER and PAUL EMIL BLEIGNIER, through Empath, offered and paid $10,000 in the form of illegal kickbacks and bribes to MedSymphony, which were paid from Empath Account 2.

e. On or about September 24, 2018, PAUL ADAM WEXLER and PAUL EMIL BLEIGNIER, through Empath, offered and paid $8,000 in the form of illegal kickbacks and bribes to MedSymphony, which were paid from Empath Account 2.

f. On or about October 1, 2018, PAUL ADAM WEXLER and PAUL EMIL BLEIGNIER, through Empath, offered and paid $10,000 in the form of illegal kickbacks and bribes to MedSymphony, which were paid from Empath Account 2.

g. On or about October 15, 2018, PAUL ADAM WEXLER and PAUL EMIL BLEIGNIER, through Empath, offered and paid

$8,000 in the form of illegal kickbacks and bribes to MedSymphony,

which were paid from Empath Account 2.

All in violation of 18 U.S.C. § 371.

## COUNTS SIX THROUGH EIGHT
### (Receipt of Kickbacks in Connection with a Federal Health Care Program)

44.     Paragraphs 1 through 33 of Count One of this Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

45.     On or about the date set forth below in each count, in the Middle

District of Florida, and elsewhere, the defendants,

PAUL ADAM WEXLER and
PAUL EMIL BLEIGNIER,

aided and abetted by each other and others, did knowingly and willfully solicit and

receive, any remuneration, that is, kickbacks and bribes, directly and indirectly,

overtly and covertly, in cash and in kind, in return for referring an individual to a

person for the furnishing and arranging for the furnishing of any item and service for

which payment may be made in whole and in part under a Federal health care

program, that is Medicare and Medicare Advantage plans, as set forth below:

| Count | Approx. Date of Kickback Payment | Approx. Kickback Amount | Description of Kickback Payment |
|-------|------|------|------|
| **SIX** | June 21, 2018 | $3,200 | Wire transfer transaction reference number ending in 5337 deposited in Empath Account 1. |
| **SEVEN** | June 26, 2018 | $7,300 | Wire transfer transaction reference number ending in 2943 deposited in Empath Account 1. |
| **EIGHT** | July 20, 2018 | $19,300 | Wire transfer transaction reference number ending in 4018 deposited in Empath Account 1. |

Each in violation of 42 U.S.C. § 1320-a7b(b)(1)(A) and 18 U.S.C. § 2.

## COUNTS NINE THROUGH TWELVE
### (Payment of Kickbacks in Connection with a Federal Health Care Program)

46.     Paragraphs 1 through 33 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

47.     On or about the date set forth below in each count, in the Middle District of Florida, and elsewhere, the defendants,

PAUL ADAM WEXLER and
PAUL EMIL BLEIGNIER,

aided and abetted by each other and others, did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, as set forth below, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing,

22

leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is Medicare and Medicare Advantage plans, as set forth below:

| Count | Approx. Date of Kickback Payment | Approx. Kickback Amount | Description of Kickback Payment |
|---|---|---|---|
| NINE | September 18, 2018 | $10,000 | Wire transfer transaction reference number ending in 0679 drawn from Empath Account 2. |
| TEN | September 24, 2018 | $8,000 | Wire transfer transaction reference number ending in 1102 drawn from Empath Account 2. |
| ELEVEN | October 1,2018 | $10,000 | Wire transfer transaction reference number ending in 1411 drawn from Empath Account 2. |
| TWELVE | October 15, 2018 | $8,000 | Wire transfer transaction reference number ending in 1122 drawn from Empath Account 2. |

Each in violation of 42 U.S.C. § 1320-a7b(b)(2)(B) and 18 U.S.C. § 2.

## FORFEITURE

48.    The allegations contained in Counts One through Twelve are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

49.    Upon conviction of the violation of 18 U.S.C. §§ 1347, 1349, and 1343, and 42 U.S.C. §§ 1320a-7b(b)(1) and 1320a-7b(b)(2), the defendants shall forfeit to

the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

50.    The property to be forfeited includes, but is not limited to, the $1,165,602.55 in proceeds the defendants obtained as a result of the commission of the offenses.

51.    If any of the property described above, as a result of any act or omission of the defendants:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the Court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the

provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

A TRUE BILL,

███████████

FOREPERSON


KARIN HOPPMANN
Acting United States Attorney

By: _____
Alejandro J. Salicrup
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

By: _____
Joseph S. Beemsterboer
Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By: _____
Jay G. Trezevant
Assistant United States Attorney
Chief, Economic Crimes Section, Tampa Division